UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, GENERAL COMMITTEE OF ADJUSTMENT, CENTRAL REGION,<br><br>Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>Defendant. | No. 10 C 8296<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This dispute surrounds changes made to the vacation planning methods implemented by Union Pacific Railroad Company ("UP" or "Carrier"). The Brotherhood of Locomotive Engineers and Trainmen ("BLET" or "Union") opposes the changes and asks that I issue a preliminary injunction requiring UP to return all vacation planning to the status quo as it existed in 2010 until the dispute is resolved though arbitration. In the alternative, BLET asks that I order the parties to arbitrate the issues on an expedited 60-day basis and require UP to make the engineers whole if its unilateral forcing of vacations is not approved in the arbitration. For the following reasons, BLET's motion for a preliminary injunction is denied.

## II. STATEMENT OF RELEVANT FACTS

UP requires that all engineers be "full time" employees "marked up" and available for work on a seven-day, 24-hour basis. When called, engineers must present themselves at the

terminal within one and a half and two hours.  Because of the engineers' unpredictable schedules, planned vacation time is very important to the engineers and their families.

The parties have a National Agreement which addresses vacation and scheduling. Pursuant to the National Agreement, "due regard" shall be given to the preference of employees in the seniority order in the class of service in which engaged.   The representatives of the carriers and the employers further agree to cooperate in arranging vacation periods.

In 1990, an award by Arbitrator La Rocco stated that "the Carrier should oblige the employee in fixing vacation dates in accordance with his desires or preferences, unless by doing so would result in a serious impairment in the efficiency of operations which could not be avoided by the employment of relief workers at that particular time or by the making of some other reasonable adjustment."  A second award by La Rocco in 1993 provided that UP could not require vacations to be "flat lined" or spread out evenly or inflexibly over a 52 week period, without regard to service needs and engineers' preferences.  The 1993 award also states that if a Carrier wishes to place an inflexible or absolute cap on the number of engineers who can take vacation during any single week, the Carrier must justify the cap by needs of service.

Traditionally, the process of setting vacations proceeded as follows.  First, engineers submit their preferred vacation dates to their BLET Local Chairman.  The Local Chairman then reviewed all requests, accounted for seniority, and then passed to the Carrier the BLET vacation requests.  Following the submission, negotiations might take place as to the maximum numbers of engineers who are allowed to take vacations at one time, though usually an agreement was reached that was acceptable to both the BLET and the Carrier.

In 2009, BLET opposed UP's 2010 vacation scheduling efforts. In particular, the Kansas City and St. Louis vacation groups were unable to reach an agreement with UP until February, 2010. At the heart of these disagreements were cut backs in the number of engineers who were allowed to take vacation on any particular week. In some areas, the Carrier cut back the number of vacation slots available per week from fifteen to seven or eight. The Carrier also required a minimum number of engineers to be off every week of the year. BLET argued that these changes resulted in an impermissible denial of their preferences. They further contended that the Carriers had not shown that its service needs require such vacation scheduling. Pursuant to the Agreement, a Carrier is entitled to unilaterally rearrange vacations when required by the service needs of the company.

The prolonged talks in 2009 and early 2010 led to vacations being scheduled on a compressed 46-week year. To ensure that the 2011 schedule was prepared by the start of the year, work began on the 2011 vacation schedule in August 2010. Patrick Kenny, UP's Director of Crew Utilization, presented a proposed 2011 vacation schedule on November 9, 2010 which was rejected. Again, the rejection focused on a cut back in available vacation slots, and perceived "flat lining." Between November 16, 2010 and December 4, 2010 over 200 letters were sent to each Local Chairman regarding the 2011 vacation schedule. The correspondence informed the union representatives that the deadline to input their members' vacations was December 15, 2010. According to UP, "it became evident, based on BLET-GCA's failure to return calls or otherwise respond," that there would not be cooperation. An extension for inputting vacation was granted until December 21.

On December 16, 2010, UP sent a broadcast to all employees inviting them to enter their own vacation bids prior to December 21, 2010. This was a departure from previous protocol whereby engineers' vacation bids went through the Local Chairmen. On December 20, 2010 95% of employee's vacations had been scheduled. The remaining 5% were almost exclusively in the Kansas City or St. Louis service units. These units demanded up to 15 vacation slots per week with no minimums. On December 22, 2010, the Kansas City and St. Louis vacation groupings had still not been scheduled. UP extended the deadline for scheduling to December 27, 2010. Schedules were still not completed, and finally, on December 29, 2010, UP scheduled the vacations for Kansas City and St. Louis based on the offer made on December 22, 2010.

**III. DISCUSSION**

The parties argue this motion assuming that the dispute at hand is 'minor' in nature. Minor disputes are those "involving the interpretation of application of existing labor agreements." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256 (1994). Major disputes relate to the formation of collective bargaining agreements or efforts to secure them. *Id*. at 253. Though BLET argues that this Court has jurisdiction to enter an injunction in minor disputes, it does not concede that this cannot be considered a major dispute.[1] For purposes of this motion, I consider this a minor dispute.

UP opposes the injunction on two grounds. First, UP disputes that this Court has jurisdiction to issue an injunction, contending that this matter must go directly to arbitration.

---

[1] In a supplemental filing, BLET argues that the dispute at hand can be considered a major dispute because it constitutes a unilateral imposition of work rule changes which are to be sought through collective bargaining. The parties' briefs assume that this is a minor dispute, and the parties did not argue orally over this issue at the preliminary injunction hearing.

Next, UP argues that even if this Court does have jurisdiction to issue an injunction, the injunction should be denied on the merits.

Before I begin my analysis, I note that each party has a valid reason for standing their ground and applying their given leverage. From UP's perspective, unilaterally implementing vacation changes applies pressure on the Union to simply accept its modifications. Disputing any change is a costly process involving extensive negotiations and even arbitration. Furthermore, the Union runs the risk of losing at arbitration. From the Union's perspective, by not accepting the new policy, the Union can successfully delay a resolution of the process. This in turn causes the Carrier uncertainty and disrupts some of its ability to manage its employees. Though taking such positions has led to a stand off, a resolution will ultimately be reached through arbitration.

At the hearing held on January 21, 2011, I heard testimony from representatives of each side, as well as extensive legal and factual argument. I have considered both the written briefs and oral argument in reaching my decision. However, BLET's testimony and argument regarding incorrect grouping for purposes of seniority plays no part in my decision. The processes that underlie employee grouping are separate and distinct from those at issue here. It is not uncommon for erroneous grouping to occur. Here, though an improper grouping in one or two cases may have damaged a vacation schedule, it was the grouping, and not the policy at issue in this dispute, that was the cause. Additionally, though UP puts forth an argument of unclean hands, given the timing of the Carrier's implementation of the 2010 schedule in late December 2010, I am unwilling to tax the union alone for causing a delay.

A. This Court Does Have Jurisdiction To Issue A Preliminary Injunction.

In the case of minor disputes, a federal court has only limited power to order an injunction to maintain the status quo. *National Ry. Labor Conference v. International Ass'n of Machinists and Aerospace Workers,* 830 F.2d 741, 749 (7th Cir. 1987). As a general rule, a railroad may "continue to apply its interpretation of the agreement during the pendency of a minor dispute." *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794, 799 (1st Cir. 1986), cert. denied, --- U.S. ----, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986). Because the dispute itself lies within the exclusive jurisdiction of the railway adjustment board , the federal courts may issue an injunction against strikes arising out of minor disputes in order to effect the purpose of the Railway Labor Act to provide for compulsory arbitration in such disputes. *Brotherhood of Railroad Trainmen v. Chicago River & Indian Railway Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *see also Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railway Co.*, 363 U.S. 528, 531 (1960) ("M-K-T").

The status quo requirement is important because it discourages strikes while disputes are being resolved. *Shore Line R. Co. v. Transportation Union*, 396 U.S. 142, 150 (1969). BLET seeks a preliminary injunction under Section 6 of the Railway Labor Act which provides that "rates of pay, rules, or working conditions shall not be altered" during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board. 45 U.S.C. § 156. Under this section, a court may order an injunction when there is a major dispute, and a carrier attempts to, ignores or repudiates or changes the terms of an existing collective bargaining agreement. *Consolidated Rail Corp. v. Railway Labor Executives Ass'n*, 491 U.S. 299, 303 (1989).

Though BLET cites *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad* ("M-K-T), 363 U.S. 528 (1960), for the proposition that this Court has jurisdiction to enjoin UP from altering the status quo to preserve the interest in arbitration -- even in the case of a minor dispute -- they overstate the application of that case. *Brotherhood of Locomotive Engineers* states that an injunction of minor disputes is proper to prevent strikes. It does not discuss injunctions outside the context of a strike. Another case relied upon by BLET is *International Brotherhood of Teamsters Airline Division v. Frontier Airlines, Inc.*, — F.3d —, 2010 WL 5060260 (7th Cir 2010). There, the Seventh Circuit stated that "preliminary injunctions may be issued in minor disputes despite the exclusive jurisdiction of disputes of the NLRB or its counterpart in the airline industry." The cases cited by the Seventh Circuit in support of that statement, are *M-K-T*, and *National Railway Labor Conference v. International Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 749-50 (7th Cir. 1987). In both of these cases, the Courts' discussions surrounding the issuance of an injunction in minor disputes revolved around preventing strikes or other self help.

The Seventh Circuit however, has also held that a district court may issue an injunction to prevent irreparable harm. *Bhd. of Railway Engineers v. Atchison*, 847 F.2d 403, 405 n.1 (7th Cir. 1988). Specifically, the Seventh Circuit notes that "a court may enjoin employer actions that engender only minor disputes if the delay in obtaining an NRAB decision will result in irreparable harm to employees." BLET asserts irreparable harm, contending that a "long-delayed decision" would impose hardship and irreparable injury that arbitration cannot remedy. Given the precedent set by the Supreme Court and the Seventh Circuit, I find that I do have the authority to issue an injunction.

B. BLET's Request For A Preliminary Injunction Is Denied.

A plaintiff is entitled to a preliminary injunction only when it meets three requirements: (1) showing a likelihood of success on the merits; (2) an inadequate remedy at law; and (3) irreparable harm. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). In addition to these three requirements, the court must also balance the harm the moving party would endure without the injunction, with the harm the non-movant would suffer if the injunction is granted. *Id*. Finally, the court must consider "the wild card that is the public interest." *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986).

### 1. Likelihood of success on the merits

UP argues that BLET has no chance of success on the merits. To meet this requirement, the Seventh Circuit requires only a "better than negligible chance of success." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.,* 549 F.3d 1079, 1096 (7th Cir. 2008) (internal citation omitted). This is a very low threshold. Furthermore, when determining whether to grant injunctive relief against an employer when arbitration is pending, the Seventh Circuit has recognized that determinations on the merits "would intrude significantly on the arbitrator's function." *Local Lodge No. 1266, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Panoramic Corp.*, 668 F.2d 276, 284 (7th Cir. 1981). Accordingly, a plaintiff need only establish that he advocates a sound position. *Id*. Though UP engages in a lengthy explanation of how its new policy complies with the La Rocco Awards, I find that BLET has met its burden.

### 2. Adequate remedy at law

To satisfy this requirement, BLET must show that absent court intervention, any remedy would be "seriously deficient as compared to the harm suffered." *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). UP argues that BLET has an obvious remedy at law: arbitration through the RLA. BLET disagrees. Practically speaking, BLET contends that the arbitration process, even assuming a victory, will not be able to compensate engineers who are forced to take vacation, or who are denied their vacation preferences.

I am unpersuaded by BLET's arguments. The Union's harm is almost certainly capable of monetary compensation; disappointment is not irreparable in the classic sense of the word, and emotional suffering is commonly compensated by cash. UP has agreed to an expedited arbitration of this dispute, and the arbitrator is capable of offering full relief. Whatever harm that would be done to individuals by an arbitration that consumes more than sixty days can be adequately compensated by cash, days off, or similar pecuniary remedies. Accordingly, I find that BLET has an adequate remedy available at law.

### 3. Irreparable Harm

The Seventh Circuit has recognized, in the context of a suit over Family and Medical Leave Act rights, that "working conditions pose problems for the workers. For instance, some workers are "on call", meaning they have no regularly set days off and may be called to duty at any time consistent with federal laws." *Brotherhood of Maint. of Way Employees, et al., v. CSX Transp., et al.,* 478 F.3d 814, 819 (7th Cir. 2007). Likewise, the Court recognized that "workers cherish their vacations" and noted that "vacation agreements are the subject of apparently hard bargaining. Their right to time one's vacation and, to perhaps a slightly lesser degree, personal leave days, is a hard-won right of railroad workers." *Id*. Accordingly, BLET argues that

9

depriving workers of their vacation preferences would inflict irreparable injury on many engineers. "There is no way to give a person back time spent with a toddler as they begin to walk or talk, with family members enjoying time together, and countless other events which engineers plan for their vacations."

UP states that BLET cannot show irreparable harm because "at worst, a UP employee may be instructed to take a paid vacation when the needs of service allow for it, rather than on the week of the employee's preference." This, argues UP, does not amount to irreparable harm. I agree. As noted above, any harm done to individual union members can be compensated through cash awards or additional days off. Though there will be the inevitable disappointment of an unplanned forced vacation, or cancelled plans, this is not irreparable in the classic sense of the word; emotional suffering is commonly compensated by monetary awards. I further note that even by the actual terms of the Agreement, harm is not irreparable. The Carrier has always retained the power to rearrange vacations at any time if the service needs of the railroad so dictate.

Finally, BLET argues that the Carrier is rewarding those engineers who have acquiesced to the Carrier's invitation to deal directly as to vacation slots. "The message is all too clear: If you acquiesce to the Carrier's requests to change working conditions and attempt to ice out the Union from its statutory and contractual role, you will be rewarded; if instead you insist on the Carrier respecting agreements and practices and through your lot with the Union, you will be punished." As discussed below, any loss in stature or authority that the Union faces in the absence of an injunction is not irreparable.

4. Balance of Harms and Public Interest

The balance of harms in this case results in a tie. There are two aspects to the harm UP will suffer. The first is monetary cost. UP states that cost of retraining engineers, and recalling and retraining furloughed employees is great; in 2010, UP incurred retraining costs for the Kansas City Service Unit in excess of 1.8 million dollars, and for the St. Louis Service Unit in excess of 1.5 million dollars. Though these costs are substantial, they are typical. Each year requires a certain amount of retraining to accommodate vacation schedules, and UP does not contend that 2010 was unique. It is the 'cost of doing business.' A second harm to UP, if an injunction is issued, is seen in its inability to manage personnel effectively. Though disruptive, the situation will be temporary as the arbitrator's award will confirm the proper procedures to be followed and vacation scheduling will resume a normal pattern. This is the same injury that the Union faces in the absence of an injunction. Without a return to the status quo, the Union leadership faces damage to its stature and authority. If the Union goes on to win at arbitration, its strong stance will be vindicated and its stature will be restored. Conversely, if it loses, it will be placed in a position where it can assure its members that it 'fought to the death' for its members.

Similarly, when the public interest is considered, the result is a tie.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is denied. Pursuant to this order there will be no further broadcasts from UP to its employees encouraging direct scheduling. I further deny Plaintiff's request to order the arbitrator to make BLET's employees whole in the event they are successful at arbitration. The arbitrator is entitled to award an entire remedy. As he has not declined to issue such relief, it is not ripe for me to rule on this issue.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: January 24, 2011